# FIRST DISTRICT COURT OF APPEAL
## STATE OF FLORIDA

_____

No. 1D19-1281
_____

NATALIYA RENO,

    Petitioner,

v.

RICHARD RENO,

    Respondent.

_____

Petition for Writ of Certiorari—Original Jurisdiction.

October 3, 2019

JAY, J.

The Former Wife has filed a petition for writ of certiorari seeking review of the trial court's Order on Former Husband's Motion for Mental Health Evaluation of Former Wife, entered pursuant to Florida Family Law Rule of Procedure 12.360(1). Relief by way of a petition for writ of certiorari requires a demonstration of material injury not remediable on appeal—the jurisdictional threshold—and a departure from the essential requirements of the law. *Oldham v. Greene*, 263 So. 3d 807, 811 (Fla. 1st DCA 2018) (citing *State, Dep't of Revenue v. Hartsell*, 189 So. 3d 363, 364-65 (Fla. 1st DCA 2016)). "Ordering a compulsory medical examination meets the jurisdictional threshold." *Id.* (citing *J.B. v. M.M.*, 92 So. 3d 888, 889 (Fla. 4th DCA 2012)). Accordingly, the question of our jurisdiction having been settled,

the issue we must address is whether the trial court's order departed from the essential requirements of the law.

I.

In a bifurcated proceeding, the parties were granted a Judgment of Dissolution of Marriage on September 16, 2016. Subsequently, on March 27, 2017, the trial court heard the remaining issues set forth in the Former Husband's Petition and the Former Wife's Counter-Petition for Dissolution of Marriage, as well as the Former Husband's Amended Motion for Contempt. Two children were born of the marriage. Sadly, following the entry of the Final Judgment on the pending petitions, the parties' youngest child—four-year-old A.—found himself directly in the middle of the emotional turmoil of his parents' hostile divorce. To say that the post-dissolution atmosphere was contentious is an understatement.

Both parents have impressive credentials. The Former Husband is a pediatrician. The Former Wife is a board-certified family nurse practitioner, as well as a board-certified psychiatric nurse practitioner treating wounded and disabled veterans at a Veteran's Administration clinic. In the Final Judgment ultimately rendered on January 18, 2018, the trial court found that both parents "have the best interest of their children at heart" and "enjoy a close parent/child relationship." It also found, however, that the Former Wife had engaged in "way over the top negative behavior which places her desires over that of the children." Furthermore, the court found that "[t]he children have experienced greater stability and positivity with the Father, with the Father providing more consistent behavior towards the children." Considering the mental and physical health of the parents, the trial court found that both were in good health, but went on to note that due to the number of false reports it had received, the Department of Children and Families requested that the Former Wife undergo a mental health evaluation—which she refused to do.

Not surprisingly, the trial court found that communication between the parents concerning the children "fell short," with the Former Wife providing "minimal information" regarding the children's health needs. Also, the court found that there had been

2

numerous—unfounded—reports of domestic violence, child abuse, and neglect leveled by the Former Wife against the Former Husband. The Sheriff's Office and the Department of Children and Families were often dragged into the fray when called upon by the Former Wife to conduct welfare checks on the children and physical examinations of A., after the children had been in the Former Husband's care—complaints that were invariably found to be without substance.

Yet, notwithstanding the trial court's negative rhetoric concerning the Former Wife, in the end, it found that it was *in the children's best interests* to adopt a shared, rotating parenting plan under which each parent would have the children every other week, from Monday to Monday. The Former Husband, though, was granted sole parental responsibility "for making ultimate major decisions as to the children's medical/health needs; and academic/educational needs of the children." In addition, the court concluded "it would be beneficial for *both* parties to engage in counseling to address the stress and anger that has arisen over the course of co-parenting." (Emphasis added.) Accordingly, it ordered that both parents "seek one on one counseling for stress-related and anger issues."

We recently affirmed the trial court's Final Judgment, without opinion, in *Reno v. Reno*, 274 So. 3d 1061 (Fla. 1st DCA 2019) (table).

Meanwhile, on November 11, 2018, the Former Husband filed his Emergency Motion for Mental Examination and Supervised Timesharing pursuant to Florida Rule of Civil Procedure 1.360 and rule 12.360. In his motion, the Former Husband alleged that the Former Wife's "psychological disorder and mental problems" "substantially impact[] her ability to parent" and "prevent[] her from being able to properly care for" the minor children. He went on to claim the Former Wife's "mental health is in controversy," and "good cause" had been shown based on the joint behavior of the Former Wife and her mother in "engaging in a pattern of seeking unnecessary medical treatment for the minor children based on false allegations of physical and sexual abuse of the minor children," which reports "continue to be deemed unfounded." The Former Husband further contended:

The minor children are being subjected to painful and embarrassing prodding and scrutiny of their most private areas in a medical and law enforcement setting which is causing a harmful, negative, and detrimental effect on the children, and is completely the result of the Former Wife's continued erroneous beliefs of abuse, despite all evidence to the contrary by professional investigators. The Former Wife and her mother . . . previously contained their allegations of such abuse with the Former Husband as their target[], but now they have widened their scope to make allegations of other third parties who come into contact with the children.

The hearing on the Former Husband's motion was held on February 1, 2019. There, the Former Husband testified that the parties' sons were ages four and eight. While he agreed there had been a history of unfounded accusations brought by the Former Wife "and others" against him of physical and sexual abuse, he chose to focus on a more recent event that had occurred, which prompted his motion for a mental examination of the Former Wife.

According to his testimony, on October 15, 2018, the children were turned over to the maternal grandmother in a regularly scheduled custody exchange. Once home, the grandmother gave A. a bath and an anal exam. She then called a neighbor, who was a pharmacist, to come over to exam A.'s anus for signs of abuse. After the pharmacist examined A., they called another neighbor, who was allegedly a nurse, and took A. to her home for an additional examination. One of those neighbors contacted the Department of Children and Families and made a complaint. A. was taken to the emergency room where he was examined by a physician's assistant based on the grandmother's complaint that there was rectal redness, stretching, and bruising noted on A.'s anus following his return from his father's house.

According to the Former Husband, when A. was asked at the hospital if he had any "boo-boos," he smilingly said no. But then, the Former Husband recited directly from the hospital report, which recounted the Former Wife's claim that A. had told her and the others at her house that

4

Jacob and his Father put something in his bottom and played with his bottom. Grandmother states that eight months ago or so, the child came to her and [said] his pee-pee was yum-yum, and that you eat it. Grandmother states that she asked the older brother and he wouldn't tell them anything for two days, and then he told her that Jacob took him upstairs and made the child eat his pee-pee and told the child it was yummy.

No one at the hearing ever explained who "Jacob" was.

A thorough examination by the physician's assistant uncovered only a rash, and no sign of rectal trauma. Continuing to read from the medical record, the Former Husband stated that the Former Wife had asked whether A. needed a rape kit performed. The maternal grandmother interposed that she had been in child care for over twenty years and was "very convinced" that A. had been molested. A call had earlier been made to the Walton County Sheriff's Office, and a "Deputy McIntosh" was listed on the report as being the responding officer. A child investigator from the Walton County office of the Department of Children and Families was contacted and advised the deputy that "no rape kit was recommended."

The Former Husband was willing to accept that the earlier false allegations of molestation brought against him by the Former Wife were motivated by malice, but presently, his concern was that she had a mental disorder, insofar as she really believed he was abusive. When asked how it was negatively affecting the children, the Former Husband expounded generally that they had "to undergo embarrassing and uncomfortable and frightening physical exams, including genital and anal exams, sometimes by multiple strangers," and opined that the children should not be "guinea pigs for some sick ulterior motives." Although the Final Judgment had awarded him ultimate decision-making on all medical issues with the children, he asserted that the Former Wife never consulted with him first, before taking the children to the emergency room. He testified that all the complaints to the Department of Children and Families had been ruled to be unfounded. He attributed the cause of A.'s "perianal dermatitis" to his chronic constipation. When A. was with him, he treated the

condition with high fiber foods and "gentle laxatives." Yet, despite the foregoing parade of horribles described by him, the Former Husband admitted that he willingly exchanged weekly custody of the children to the former Wife—earlier than scheduled one weekend in order that he and his current wife could celebrate their wedding anniversary.

Funmilayo Reno, the Former Husband's current wife, testified that she believed the Former Wife and her mother were acting in concert to create a volatile environment, causing A. to scream when the exchange took place between her and the grandmother. Mrs. Reno claimed that the grandmother would often whisper something to the children "in Russian" during the exchange, invariably causing them to cry before handing them over to her. Mrs. Reno suggested that it was the Former Wife and the grandmother who were actually physically harming the children so they could later blame it on the Former Husband. That belief was based on comments made to her own mother by the eldest child to the effect that his maternal grandmother had hit him. She also said that A. is "constantly saying something." Mrs. Reno denied seeing anything wrong with A.'s rectum when she bathed him, and she confirmed that he suffered from chronic constipation.

According to Deputy Jeffrey McIntosh's testimony, when he responded to the Former Wife's home on October 15, 2018, he met with the Former Wife, the grandmother, and the two neighbors. He was not informed that one of the neighbors was a nurse, but he did know that the other neighbor was a pharmacist. He was told that when the grandmother picked up the children after they had been at their father's house, A. complained that his bottom hurt. When she got him home, the grandmother examined A. and noticed the redness and what she thought was swelling around his anus. When the Former Wife arrived home, she thought she also saw some bruising. Deputy McIntosh said he did not examine A., but he did look at some photographs taken by one of the neighbors. He contacted the Department of Children and Families and explained the situation to an investigator. He then relayed the information he received from the investigator to the Former Wife. She made the decision to take A. to the emergency room. Significantly, Deputy McIntosh did say that in all of his dealings with the Former Wife, he did not detect in her any mental disorder.

6

He also affirmed that he took seriously the allegations of child abuse on the day in question.

The last witness to testify was Dr. Jennifer Masino, a clinical psychologist who had been counseling the Former Wife for the past two years. In her opinion, she saw no evidence that the Former Wife had a psychological disorder. She said that "[t]o the contrary," she found the Former Wife "to be quite resilient in the face of a lot of stressful circumstances." The Former Wife had informed Dr. Masino on "numerous" occasions of her belief that the children were being abused by her ex-husband, but the Former Wife never asked her to report it to the Department of Children and Families. However, in accordance with her professional duty, Dr. Masino did report the alleged abuse to the authorities. She remarked that she had no reason to believe that the Former Wife's reports were not made in good faith and reiterated that she saw no evidence "of a mental illness, especially one that would endanger the children." Dr. Masino testified that she had discerned no "pathology" in the Former Wife that would call for additional psychological testing.

At the conclusion of the hearing, the trial court made an oral finding that, to the extent the Former Husband's request for a mental health examination of the Former Wife was "relevant to the parenting and contact with the children," it was "a matter in controversy." It then announced that the salient issue remained to be determined was whether "good cause" for the examination had been demonstrated.

Later, on March 6, 2019, the trial court entered its Order on Former Husband's Motion for Mental Health Evaluation of Former Wife. In the order, the court found "a pattern by Former Wife to not simply seek medical attention for a child, but rather to insist that a particular diagnosis of intentional abuse be included in treatment notes for the child." It further noted that the Former Wife had been in counseling "for an extended period of time to deal with the pressures resulting from her divorce." The court expressly declared it was "persuaded" that the Former Husband's motion was *not* an effort "to alter the child custody determination previously rendered in this cause." It did, however, express its concern "about the effect the repeated reports of abuse and the contacts with law enforcement, child advocates, medical personnel

7

and medical exams which follow the reports [brought] to these children," and it found that "the anxieties of a child being examined in the most personal of ways by strangers . . . seem[ed] lost on the Former Wife." The court further found that the Former Wife's "apparent lack of awareness of the emotional harm being thereby caused to these young children constitute[d] good and sufficient cause . . . to order that the Former Wife submit to a compulsory mental health examination" to determine her fitness to parent the parties' children.

Despite its concerns, however, the trial court denied the Former Husband's motion to restrict the Former Wife's time-sharing of the children to "supervised only." The court did not believe that the facts of the case rose to the level where the well-being of the children was at stake. Therefore, it held, pending the submission of a psychological evaluation, it would not alter the time-sharing established by the Final Judgment.

## II.

As we observed in *Oldham v. Greene*:

> Pursuant to rule 12.360, a request for a psychological examination must be related to "a matter in controversy," and the party must have "good cause for the examination." Fla. Fam. L. R. P. 12.360(a)(1),(2). The requesting party has the burden to satisfy the "in controversy" and "good cause" prongs. *Manubens v. Manubens*, 198 So. 3d 1072, 1074 (Fla. 5th DCA 2016); *see also* Fla. Fam. L. R. P. 12.360(a)(1),(2). A court's failure to make any findings as to the requirements of rule 12.360 is a departure from the essential requirements of law. *See Russenberger v. Russenberger*, 623 So. 2d 1244, 1245-46 (Fla. 1st DCA 1993), *aff'd* 639 So. 2d 963 (Fla. 1994); *Manubens*, 198 So. 3d at 1074-75; *cf. Wade v. Wade*, 124 So. 3d 369, 375 (Fla. 3d DCA 2013) (explaining the complete failure to address a requirement "alone may be sufficient to overturn the trial court's order").

263 So. 3d at 811-12.

8

## A. *"In Controversy"*

The "in controversy" element was examined at length in *Oldham*, where we defined the concept as follows, giving examples of when mental health is, and is not, "in controversy." We said:

> Seeking custody, in and of itself, does not place the parent's mental condition "in controversy," *Wade*, 124 So. 3d at 375, nor is "mere relevance to the case" sufficient. *Russenberger*, 623 So. 2d at 1245. The mental condition alleged "must directly involve a material element of the cause of action." *Williams v. Williams*, 550 So. 2d 166, 167 (Fla. 2d DCA 1989). *There must be "verified allegations that the parent in question is having mental problems that could substantially impact his or her ability to properly raise children." Wade*, 124 So. 3d at 375; *see also Asteberg v. Russell*, 144 So. 3d 606, 608 (Fla. 2d DCA 2014) (a belief the primary residential parent is not supporting and promoting the child's relationship with the other parent did not put mental health in controversy); *Williams*, 550 So. 2d at 167 (claims a father failed to use a car seat for the child, that the child wet his pants after a visit with the father, and that the father used bad language in front of the child and was unstable were insufficient to put the father's mental health in controversy). Mental health has been declared "in controversy" where a father seeking parental responsibility made comments to a minor child that he was contemplating suicide. *Barry v. Barry*, 159 So. 3d 306, 307-08 (Fla. 5th DCA 2015). Baker Act proceedings or a diagnosed schizoaffective disorder can place mental health in controversy. *Bailey v. Bailey*, 176 So. 3d 344, 346-47 (Fla. 4th DCA 2015); *J.B.* [*v. M.M.*], 92 So. 3d 888[,] 890 [(Fla. 4th DCA 2012)].

263 So. 3d at 812 (emphasis added). We moved on to stress that "[t]he focus of rule 12.360 is not on good or bad parenting, but on something larger, some greater indicator of deeper mental health concerns." *Id.* We also noted: "The burden of proof is heightened when the party subject to the request for an examination has not

9

voluntarily placed that issue in controversy." *Id.* (citing *Wade*, 124 So. 3d at 373).

In the case at bar, the trial court, at the conclusion of the hearing, orally found the Former Wife's mental health to be "in controversy," with little elaboration other than it was "relevant to the parenting and contact with the children." But as *Oldham* held, "'mere relevance to the case'" is not sufficient. *Id.* (quoting *Russenberger*, 623 So. 2d at 1245). There were no findings made of any kind exemplifying mental illness on the level mentioned in the above quote. Certainly, the Former Wife did not voluntarily place her mental health in controversy. And, however disturbing one might view her behavior towards the Former Husband regarding his alleged treatment of A., nothing in the evidence presented by the Former Husband was sufficient to meet the "heightened burden" suggesting "some greater indicator of deeper mental health concerns." *Id.*

Moreover, neither the trial court nor the Former Husband seemed to be so moved by the Former Wife's alleged mental health issue as to seek immediate removal of the children from her care. The trial court was "persuaded" that the Former Husband's motion was "not an effort by [him] to alter the child custody determination previously rendered in this case." And the Former Husband tellingly testified that when he and his current wife wanted to celebrate their wedding anniversary, he was more than willing to transfer physical custody of the children to the Former Wife earlier than scheduled, despite his belief that the Former Wife had a "psychological disease."

Besides, as revealed above, the mental health of the Former Wife was never placed at issue by the Former Husband's dissolution petition or afterwards, prior to the entry of the Final Judgment, even though he filed motions for contempt due to the Former Wife's harassment. The trial court at that point acknowledged the highly charged nature of the case before it and ordered that both parties receive counseling for anger management and to relieve the stress. As was true in *Oldham*, it stands to reason here that the foregoing actions contradict a firm belief that the Former Wife suffers from mental health issues beyond the ordinary stress associated with an acrimonious and

10

bitter divorce—when, as is so often the case, the children are the victims of the parents' dispute. *Id.* at 813. Therefore, we conclude that the trial court departed from the essential requirements of the law in finding that the Former Wife's mental health was "in controversy."

## B. *"Good Cause"*

But even if the "in controversy" prong was satisfied, we hold that the Former Husband failed to establish the requisite "good cause" for a psychological evaluation of the Former Wife. "Good cause should be based on evidence that the parent has been unable to meet the needs of the children. . . . The requesting party must show that the alleged mental illness places the child at risk of abuse, abandonment or neglect." *Oldham*, 263 So. 3d at 813 (internal quotation marks omitted) (citations omitted). Moreover, "it belies good cause to believe a party's mental status would jeopardize a child's well-being, where a court orders a psychological evaluation and also awards continued timesharing, unsupervised and overnight, with that party." *Id.* (citing *Wade*, 124 So. 3d at 376-77).

Below, the trial court expressed concern over the claimed "emotional harm" suffered by the children while being examined "in the most personal way by strangers," and believed this fact was "lost" on the Former Wife. But there was absolutely no quantitative proof that the youngest child, A.—who truly was caught in the middle of this difficult mess—was suffering emotionally, much less suffering abuse, abandonment, or neglect. Furthermore, the Former Wife did not testify at the hearing, and there was no other evidence to support the trial court's perception that the supposed emotional repercussions on the children were "lost" on her. Although the trial court emphasized that the Former Wife was seeing a psychologist due to the stress of the divorce, it ignored the fact that it had earlier ordered *both parties* to seek counseling to deal with anger and stress issues. And again, we note the trial court's express finding that the Former Husband's motion was not "an effort" "to alter the child custody determination previously rendered" in the cause, which "belies good cause to believe a party's mental status would jeopardize a child's well-

11

being." *Id.* Thus, the evidence presented failed to meet the necessary standard.

We close by once more turning to our decision in *Oldham*, which acknowledged the weighty due process and privacy considerations that hang in the balance in these types of proceedings:

> A forced psychological examination has serious privacy implications; people have the right to be free from compulsory examination absent circumstances meeting the requirements. *In the Interest of T.M.W.*, 553 So. 2d 260, 263 (Fla. 1st DCA 1989) (quoting *Schottenstein* [*v. Schottenstein*], 384 So. 2d [933 (Fla. 3d DCA 1980)]). The Florida Supreme Court has cautioned against the use of mental health evaluations as vindictive tools in family law cases. *See Russenberger*, 639 So. 2d at 966 ("A parent's request for a psychological evaluation may well be an expression of that parent's vindictiveness and could have the effect of making the child a victim.").

263 So. 3d at 813.

## III.

The evidence failed to establish that the Former Wife's mental condition was "in controversy," and that "good cause" existed for a psychological evaluation. Accordingly, the trial court's order granting the Former Husband's motion for a mental health evaluation departed from the essential requirements of the law. The order is QUASHED.

ROBERTS, J., concurs; WOLF, J., dissents without opinion.

———————————————

***Not final until disposition of any timely and authorized motion under Fla. R. App. P. 9.330 or 9.331.***

———————————————

R. Hadley Sanders, Hadley Sanders, P.A., Pensacola, for Petitioner.

No appearance for Respondent.